IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

KOYO BATTERY CO., LTD.,          )
                                 )
              Plaintiff,         )        Case No: 08-C-274
                                 )
      v.                         )        Judge Conlon
                                 )        Magistrate Judge Valdez
MICHAEL J. LUNKES and            )
CELL SOURCE DISTRIBUTION, INC. and )      Jury Trial Demanded
ILLINOIS BATTERY CORPORATION     )
and MICHAEL T. LUNKES and WILLIAM )
LUNKES AND JAMES LUNKES,         )
                                 )
              Defendants.        )

<u>**EXHIBITS TO DEFENDANTS' RESPONSES TO PLAINTIFF'S STATEMENT OF
MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY
JUDGMENT**</u>

**Exhibit A:**    Complaint

**Exhibit B:**    Michael J. Lunkes Deposition Excerpts

**Exhibit C:**    Affidavit of Michael T. Lunkes

**Exhibit D:**    *Pioneer Bank & Trust Co. v. Resolution Trust Corp.*, No. 91 C 6292, 1995 WL
                  324578 (N.D. Ill. May 26, 1995)

**Exhibit E:**    *TruServ Corp. v. Flegles Inc.*, No. 03 C 3284, 2004 WL 2203429 (N.D. Ill. Sept.
                  29, 2004)

**Exhibit F:**    *Taylor v. Bekin Van Lines Co.*, No. 95 C. 2886, 1996 WL 14004 (N.D. Ill. Jan.
                  12, 1996)

# **<u>EXHIBIT A</u>**

**FILED**

**JANUARY 11, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

KOYO BATTERY CO., LTD.　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Plaintiff,　　　　)　　Case No.:
　　　v.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
MICHAEL J. LUNKES and　　　　　　　)　　Jury Trial Demanded
CELL SOURCE DISTRIBUTION, INC.　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　Defendants.　　　)

**08 C 274**

**JUDGE CONLON**
**MAGISTRATE JUDGE VALDEZ**

## COMPLAINT

Plaintiff, KOYO BATTERY CO. LTD ("Koyo") by and through its attorneys, David Fish

and Stephen Hsu for its Complaint against Defendants MICHAEL J. LUNKES ("Lunkes") and

CELL SOURCE DISTRIBUTION, INC. ("Cell Source") state as follows:

### PARTIES

1.　　Koyo is a Taiwanese company organized and existing under the laws of Taiwan.

Koyo is, therefore, a citizen of Taiwan.

2.　　Defendant Lunkes resides in the state of Illinois and therefore is a citizen of

Illinois.　Defendant Cell Source is an Illinois corporation in bad standing with the Illinois

Secretary of State.　Cell Source is, therefore, an Illinois citizen.

### JURISDICTION and VENUE

3.　　This Court has jurisdiction pursuant to 28 U.S.C. § 1332 (a) (2), based upon the

complete diversity of citizenship of the parties and the amount in controversy exceeding the

jurisdictional minimum of $75,000.

4.　　Venue is proper in this Judicial District because the Defendants reside in this

Judicial District, because products were shipped into this Judicial District, and because

Defendants breached their contractual obligations within this Judicial District.

1

## BREACH OF CONTRACT-COUNT I

5.      Plaintiff and Defendants entered into a legally binding contract for the sale of batteries.  The terms of the parties' contract required that Defendants pay the Plaintiff for batteries ordered.

6.      Plaintiff has performed all conditions required of it under the parties' agreement.

7.      Defendants have failed to pay for $485,287.91 in batteries which were shipped to them pursuant to their parties' agreement.

8.      As a result, Plaintiff has been damaged.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests that this Court enter judgment in its favor and against Defendants for $485,287.91, as well as for an award of prejudgment interest as allowed by law including 815 ILCS 205/2, an award of costs, for preliminary injunctive relief, and for such other relief as this Court deems appropriate.

### Plaintiff demands trial by jury.

Dated:  January 11, 2008

Respectfully submitted,

KOYO BATTERY CO. LTD.

By:        _____/s/ David Fish_____
                    One of its attorneys

Stephen Hsu
LAW OFFICES OF STEPHEN HSU
2822 N. Ashland Avenue, #201
Chicago, IL 60657
(773) 244-1875

David J. Fish
THE FISH LAW FIRM, P.C.
1770 North Park Street, Suite 200
Naperville, Illinois 60563
(630) 355-7590

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KOYO BATTERY CO.,           )
LTD.,                       )
                            )
        Plaintiff,          )
                            )    No. 08 C 274
    vs.                     )
                            )
MICHAEL J. LUNKES and       )
CELL SOURCE                 )
DISTRIBUTION, INC.,         )
                            )
        Defendants.         )
_____

COPY

## DEPOSITION OF MICHAEL JOSEPH LUNKES
## May 2, 2008 - 10:59 a.m.

Deposition taken pursuant to the

applicable provisions of the Federal Rules of

Civil Procedure pertaining to the taking of

depositions, before Teresa S. Grandchamp, C.S.R.,

taken at 1770 North Park Street, Suite 202,

Naperville, Illinois.

D-846708



DEPO • COURT
reporting service

DUPAGE COUNTY
1212 S. Naper Blvd., Ste. 119-185
Naperville, IL 60540

630-983-0030 • Fax 630-907-9710
Email: depocourt@comcast.net

KANE COUN
1051 Ketel A\
North Aurora, IL 605

                                                              2

1       PRESENT:

2            FISH LAW FIRM, P.C.
             1770 North Park Street, Suite 202
3            Naperville, Illinois 60563
             BY:  MR. DAVID J. FISH
4                      and
             LAW OFFICES OF STEPHEN C. HSU
5            2822 North Ashland Avenue, Suite 201
             Chicago, Illinois 60657
6            BY:  MR. STEPHEN C. HSU,
                   appeared on behalf of Plaintiff;
7
             JENNER & BLOCK
8            330 North Wabash Avenue
             Chicago, Illinois 60611
9            BY:  MR. MICHAEL P. DI NATALE,
                   appeared on behalf of Defendants.
10
        ALSO PRESENT:
11
             MS. LESLIE KAN
12
                        -  -  -
13

14

15

16

17

18

19

20

21

22

23

24

31

1  know of any obligations, frankly.  We don't resell

2  anything retail; therefore, we're not collecting

3  state sales tax, and everything that we are -- I

4  was going to say that everything we're obliged to

11:35AM  5  pay, I don't know what that is, and as far as I

6  know, no one is saying you have to pay this.

7      Q.   Have the 2007 tax returns been filed for

8  CSD?

9      A.   No.

11:35AM  10     Q.   Has an extension, a request for an

11  extension, ever been filed?

12     A.   I believe so.

13     Q.   Do you know whether the '06 tax returns

14  were ever filed?

11:36AM  15     A.   I think '05's were.  I don't think '06's

16  were.

17     Q.   Did you review the bank statements of

18  CSD on a regular basis?

19     A.   Not really.  I -- you know, I looked to

11:36AM  20  see -- or I wanted to know what the balance was,

21  but I wasn't checking off every item and

22  reconciling the account.

23     Q.   When CSD started, why were you willing

24  to guarantee such a large loan from LaSalle for

32

1  the company?

2      A.   Out of ignorance.  If I were doing it

3  again, there is no way that I would, and I

4  shouldn't have.

11:36AM 5      Q.   Why do you say that?

6      A.   I shouldn't have because it's hurt me,

7  and I don't know that we -- we may have gotten the

8  loan without putting up that guarantee.  I'm not

9  sure.  But I wouldn't readily volunteer to do it.

11:37AM 10     Q.   What have been the monthly revenues for

11  CSD over the past six months?

12     A.   That I don't know exactly, but I could

13  give you a guesstimate or an approximate and say

14  that they're 25- to 30,000.

11:37AM 15     Q.   And where is that revenue coming from?

16     A.   Sales.

17     Q.   Sales of Koyo batteries?

18     A.   Both.

19     Q.   Okay.  Why isn't any of that money being

11:37AM 20  paid to Koyo?

21     A.   I don't know the reason for that.

22  That's not really a decision that I would be the

23  one to say, hey, let's do it.  I've never -- I

24  never spoke to Vicki, other than at a -- at a

33

1   trade show or a convention, and -- but as far as

2   e-mailing and faxing and talking on the phone

3   about what's going to be paid and when it's going

4   to be paid, I -- that -- I had never got involved

11:38AM   5   in that.

6        Q.   Who makes the decision about which

7   obligations to pay?

8        A.   That would be Michael.

9        Q.   Your son?

11:38AM   10       A.   Yes.

11       Q.   Other than LaSalle and Koyo, who are the

12   other main creditors of CSD?

13       A.   There is an advertising company.  I

14   can't think of the name.  There is an advertising

11:39AM   15   company in Pennsylvania that is owed money.  There

16   is a freight company.  There is a freight company

17   that -- I think it's out of Chicago, but I'm not

18   sure.  And there may be one other company that's

19   owed money, but I don't know.

11:39AM   20       Q.   Those two or three companies other than

21   LaSalle and Koyo, do you have a ballpark estimate

22   of the total amount owed to them?

23       A.   Yeah, I could try.  The trucking

24   company, ballpark would be less than 10,000;

34

1    probably 8,000.  The company in Pennsylvania, the

2    advertising company, I would say that the amount

3    owed them is about 15,000.

4        Q.    All right.  Approximately how much is

11:40AM  5    owed to LaSalle?

6        A.    $450,000.

7        Q.    Okay.  And has LaSalle threatened to

8    take any action against any of the guarantors of

9    that loan?

11:40AM  10       A.    No, but that day will be coming in the

11    near future, I think, and the reason it hasn't

12    come is because we've been able to keep current

13    with payments.

14       Q.    What do you acknowledge that you owe to

11:41AM  15    Koyo?  Approximately.

16       A.    Well, if I had a calculator, I would do

17    it quickly.  485,000 minus 200,000 minus 160,000,

18    50,000.

19       Q.    Can you walk me through this?  What's

11:41AM  20    the 485,000 number represent?

21       A.    That number represents purchases and --

22    totally strictly purchases.

23       Q.    Okay.  But then there is some credits or

24    offsets to that?

35

1    A.    Right, exactly.

2    Q.    So you owe $485,000 to Koyo.

3    A.    Right.

4    Q.    But then there are also some --

11:42AM  5    A.    Offsets.

6    Q.    -- some other numbers, some offsets.

7    A.    Right.

8    Q.    Why don't you tell me what those are.

9    A.    Okay.  One of them, probably the biggest

11:42AM 10    one, is that debt to the advertising company,

11    Reese, R-e-e-s-e, and they're out of Pennsylvania,

12    and the amount that we -- let me think.  The

13    offsets for Reese is about $110,000, I'd say.

14    Q.    And how do you come up with that amount?

11:42AM 15    A.    Those are agreed-upon purchases that

16    were made by CSD and paid for by CSD, and the

17    agreed-upon part was that Koyo had agreed to

18    reimburse or pay for those amounts.

19    Q.    Was that just an oral agreement or was

11:43AM 20    there anything in writing to that effect?

21    A.    I believe that there were e-mails.  I

22    don't know about faxes, but I believe there were

23    e-mails to that effect.

24    Q.    Okay.  So you believe you're owed a

36

1    $110,000 credit for advertising purposes; correct?

2        A.   If that's -- yeah, I believe it's about

3    that.  I don't know exactly.

4        Q.   Okay.  And does that include amounts

11:43AM   5    that CSD has not -- not actually paid to the

6    advertising company?  I think you told me there is

7    a lawsuit or a -- there is an amount of money

8    owed.

9        A.   I didn't myself, but somebody must have,

11:44AM  10    and that's fine.  There is a lawsuit.  CS -- much

11    of the money paid to -- or owed to Reese was paid

12    for by CSD, and as I said, to my knowledge, there

13    was an agreement that that money would be

14    reimbursed from Koyo or Koyo would reimburse CSD

11:44AM  15    for those purchases.  And I don't know the exact

16    status on that, but I know that that was something

17    that had been discussed.

18        Q.   Okay.  Other than the approximately

19    $110,000 advertising credit, is there any other

11:45AM  20    credits that you believe are owed?

21        A.   Yeah.  There were some credits for

22    defective products that had been discussed and

23    should have been calculated, and I think that

24    that's one of the things that in the discussions

37

1    between the two companies, one, Michael, my son,

2    was saying, give us the credits, and Vicki from

3    Koyo was saying, I've given them to you or -- I

4    don't remember exactly, but there was a dispute

11:45AM  5    about the credits, the credits themselves.

6        Q.    Okay.  Do you have an estimate of what

7    the credits for defective products would be?

8        A.    Yeah.  I used to think that they were

9    probably around 20,000, but I think, and having

11:45AM  10    seen a couple of documents, that they might be as

11    high as 40,000 for product that wasn't good.

12        Q.    Okay.  Any other credits or offsets that

13    you believe you're entitled to?

14        A.    I can't think of any at the moment.

11:46AM  15        Q.    Okay.  So you believe off of the 485

16    that's owed to Koyo, there should be an offset of

17    somewhere between 130- to $150,000; is that fair?

18        A.    Uh-huh.

19        Q.    Yes?

11:46AM  20        A.    Sorry.  Yes.

21        Q.    Okay.  Does CSD maintain insurance?

22        A.    Yes.

23        Q.    Okay.  General liability insurance?

24        A.    Uh-huh.

70

1    Q.    Was that a face-to-face meeting?

2    **A.    It was.**

3    Q.    Okay.  Where?

4    **A.    Indianapolis.**

12:43PM   5    Q.    Okay.  Why?  Why Indianapolis?

6    **A.    It was at a trade show, a convention,**

7    **motorcycle convention in Indianapolis.**

8    Q.    And what do you remember about that

9    conversation other than what you've told me?

12:44PM   10   **A.    Nothing of interest and nothing, really.**

11   Q.    As of February of '06, did CSD owe money

12   to Koyo?

13   **A.    Yes.**

14   Q.    Okay.  And what was said during that

12:44PM   15   conversation by either you or somebody else from

16   CSD to assure Koyo that they didn't have to worry

17   about getting paid?

18   **A.    If something was said it was said by**

19   **someone else who obviously would be Michael, my**

12:44PM   20   **son, Lunkes.  I did not have any conversation as**

21   **to payment or amount owed or credits or -- which**

22   **you mentioned there were a lot of.  I don't**

23   **remember ever getting a lot of credits from Koyo.**

24   Q.    Okay.

105

Q.    -- costs.  Tell me everything you know
about what the agreement was regarding advertising
costs and Koyo's obligations to pay those.

A.    I think everything was being mentioned
01:56PM as it was proceeding.  In other words, at a
certain point everything was asked for and
received permission to do as time progressed.  In
other words, when Ray Goodearl started out with
GM, he started out with all these other accounts
01:56PM and was talking about advertising and going to
shows and all of that, and Mike Cerett also was
involved in those conversations, they would ask
Vicki, can we do this; is this okay?  Can we use
an ad in this national magazine or in this
01:57PM whatever kind of magazine saying this is a good
motorcycle battery type of thing, and, yes,
everything, I think, as time progressed, every
single thing that was being asked for or required
was given a yes or a no.

Q.    Those were conversations that took place
01:57PM between Vicki at Koyo and Ray Goodearl and Shuman
at CSD?

A.    Shuman, he's not -- he's a warehouse
guy.  The other guy is Ray Goodearl, and, yeah, it

106

1    would have been -- it would have been Goodearl.

2    Cerett would have been involved in some of the

3    conversations and my son Michael would have also

4    been involved.

01:57PM   5        Q.    Would Michael have been involved in all

6    the conversations?

7        A.    No, no.

8        Q.    Would it primarily -- would those

9    conversations primarily take place between the

01:58PM  10   other employees that you just mentioned, Goodearl

11   and Cerett --

12       A.    Yes.

13       Q.    -- and Koyo?

14       A.    Yes.

01:58PM  15       Q.    Okay.  So whatever information you have

16   about the amount of the setoff --

17       A.    Right.

18       Q.    -- comes from other people; is that

19   right?  You didn't participate personally in any

01:58PM  20   of those conversations?

21       A.    Absolutely not.  Right, that's correct.

22       Q.    Did CSD keep any records of its

23   expenditures on advertising for Koyo batteries?

24       A.    To the best of my knowledge, they did,

108

1    talking about, that kind of advertising.  So I

2    think they were all listed and I think if you ask,

3    somebody could give you a list of everything by --

4    you know, the line item detail for every one of

02:00PM  5    the things.

6        Q.   How do you know that those expenses

7    weren't incurred, for instance, on behalf of

8    another battery company?

9        A.   Because -- because those kind of

02:00PM  10   expenses were never sought after or no one else

11   had a need like Koyo did.  Koyo had a need because

12   Koyo was a new kid on the block and they were

13   competing against gigantic corporations, and the

14   other companies all had their own niche and they

02:00PM  15   had their own battery specialist that they sold

16   it -- or they sold to through dealers.  They had

17   some way where they were established and

18   well-known, and I'm afraid Koyo wasn't, and this

19   was a need to get some name recognition.

02:01PM  20       Q.   Did CSD ever sell batteries on behalf of

21   any Koyo competitors?

22       A.   CSD.  No.

23       Q.   The batteries that you -- you also said

24   there should be a 20- to $40,000 allocation for

109

1    defective batteries.

2        A.    Uh-huh.

3        Q.    How do you come up with that number?

4        A.    **Just because people would talk about it.**

02:01PM  5    **They would mention, geez, I'm not buying from you**

6    **guys, I had $20,000 worth or $15,000 worth of**

7    **defective batteries and I wouldn't buy another**

8    **Koyo battery if my life depended on it.**

9        Q.    These are your customers who we're

02:01PM  10   talking about?

11       A.    **Right.**

12       Q.    Did CSD ever have to give a credit back

13   to those customers?

14       A.    **Oh, yeah.**

02:01PM  15      Q.    And was the amount 20- to 40,000?

16       A.    **Yeah, I'd say.**

17       Q.    Okay.  Do you have --

18       A.    **It's probably closer to 20-, but it's --**

19   **it's in excess of 20-.**

02:02PM  20      Q.    Did CSD customers say this to you or are

21   you hearing it again from somebody else?

22       A.    **I heard it from one customer direct.**

23       Q.    Okay.  Who was that?

24       A.    **Battery Wholesale.**

# **<u>EXHIBIT C</u>**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS DISTRICT OF ILLINOIS
EASTERN DIVISION

KOYO BATTERY CO., LTD,                    )
                                          )
          Plaintiff,                      )
                                          )
          vs.                             )        No. 08-C-274
                                          )
MICHAEL J. LUNKES and CELL                )        Judge Conlon
SOURCE DISTRIBUTION, INC., and            )
ILLINOIS BATTERY CORPORATION              )        Magistrate Judge Valdez
and MICHAEL T. LUNKES and                 )
WILLIAM LUNKES and JAMES                  )
LUNKES                                    )
                                          )
          Defendants.                     )

## AFFIDAVIT OF MICHAEL T. LUNKES

Michael T. Lunkes, being first duly sworn, on oath states that he is of legal age, and that,
if called upon to do so, he could testify competently to the following facts:

1.      I am currently, and all times pertinent hereto was, employed by Cell Source

Distribution as a manager and my job duties include ordering batteries from suppliers and

performing tasks necessary for daily operations of the business. I have performed those

duties for Cell Source at all times pertinent hereto, and since approximately February 2005.

2.      Acting in my capacity as a manager, I personally took part in the transactions at issue

and was responsible for handling all transactions with Koyo and I have personal first-hand

knowledge of the transactions.

3.      My father, Michael J. Lunkes, is currently President of Cell Source, but he did not

take part in any of the negotiations or transactions relating to the agreement that Koyo would

reimburse Cell Source for advertising costs related to promoting Koyo's products.

4.    My father also did not take part in any of the discussions or negotiations with Koyo relating to credits or reimbursements owed by Koyo to Cell Source on account of Cell Source receiving defective batteries.

5.    I have personally reviewed the Motion for Partial Summary Judgment, Statement of Material Facts and attachments thereto submitted by Koyo. The estimated amount of set-offs that my father claimed Cell Source is entitled to are grossly inadequate. (Pls. 56.1 Statement ¶¶6-7)

6.    Although my father is correct that Cell Source spent approximately $117,000.00 on Koyo related advertising and that Cell Source was forced to reimburse its customers approximately $20,000-$30,000 as a result of defective products, he failed to account for additional set-offs that are the result of additional defective Koyo products.

7.    Early in the Cell Source's business dealings with Koyo, Koyo shipped factory activated sealed lead acid ("FA/SLA") batteries to Cell Source. FA/SLA batteries are activated at the factory prior to shipment. FA/SLA batteries need to be recharged within a certain period of time or they will no longer hold a charge. Cell Source ordered FA/SLA batteries from Koyo that it in turn sold to its own customers. Many of the FA/SLA batteries purchased from Koyo arrived at Cell Source in non-working condition and several customers returned or refused shipments because the batteries would not take a charge. Several of Cell Source's customers cancelled their orders as a result of the defective Koyo FA/SLA batteries.

8.    Although as of this time I have not reviewed all of the documentation relating to the transactions at issue, based upon my personal involvement with Koyo and with disgruntled customers, I believe Cell Source is entitled to an additional set-off of approximately $87,000.00 as a result of the defective FA/SLA batteries.

2

9. My father had no involvement with the discussions and negotiations with Koyo with regard to the defective FA/SLA batteries and therefore his estimated amount of set-offs failed to account for the substantial losses incurred by Cell Source as a result of those defects.

10. My father's testimony that Koyo is "owed" $485,000.00 is not literally accurate, because it is not based on the amount of the set-offs, of which he does not have firsthand knowledge.

AFFIANT FURTHER SAYETH NOT.

Dated: June 30, 2008

_____
Michael T. Lunkes

Subscribed and sworn to before me
this  3 0 th  day of  June  , 2008.

Notary Public

OFFICIAL SEAL
MARIA Z SANTIAGO
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:12/01/08

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.                                                                    Page 1
Not Reported in F.Supp., 1995 WL 324578 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1995 WL 324578 (N.D.Ill.))**

Pioneer Bank & Trust Co. v. Resolution Trust Corp.
N.D.Ill. 1995
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
PIONEER BANK AND TRUST COMPANY,
formerly known as Pioneer Trust & Savings Bank,
not personally but solely as Trustee under Trust
Agreement dated December 8, 1956 and known as
Trust No. 10940; Phyllis Panijel; and Muriel Velen,
Plaintiffs,
v.
RESOLUTION TRUST CORPORATION, as
Receiver of Great American Savings & Loan
Association, formerly known as Oak Park Federal
Savings & Loan Association, Defendant-Third party
plaintiff,
v.
Bernard E. BAJORAS, Third party defendant.
**No. 91 C 6292.**

May 26, 1995.

MEMORANDUM AND ORDER

MORAN, Chief Judge.
*1 Plaintiffs brought an action for breach of contract
under the Federal Deposit Insurance Act, 12 U.S.C.
§§1811*et seq.,* as amended by the Financial
Institutions Reform, Recovery, and Enforcement Act
of 1989 (FIRREA), against defendant Resolution
Trust Corporation (RTC), as receiver of Great
American Savings & Loan Association (Great
American). Plaintiffs claim that the RTC owes them
for repair costs that accrued on property Great
American occupied before the RTC was appointed
receiver. The RTC moved to dismiss plaintiffs' claim,
and we denied that motion in our memorandum and
order of July 1, 1992. Both plaintiffs and the RTC
then moved for summary judgment. In addition, the
RTC filed a third party complaint against Bernard
Bajoras, who had subleased the property from Great
American in May 1983. Bajoras in turn filed a third
party counterclaim against the RTC and named
several other parties as additional counter-defendants:
River Forest State Bank, as Trustee under Trust
Agreement Dated August 10, 1992 and known as
Trust No. 3857 (River Forest), the current legal

owner of the property; Dorothy McCarthy, the
current beneficial owner; and plaintiffs, the owners at
the time the sublease was executed. McCarthy, River
Forest, and plaintiffs have moved to dismiss Bajoras'
counterclaim. For the reasons set forth below,
plaintiffs' motion for summary judgment on its
original complaint and the RTC's cross-motion are
denied. Both motions to dismiss Bajoras'
counterclaim are granted.

*FACTS*[FN1]

Plaintiffs are the trustee and the two beneficiaries of
an Illinois land trust. In 1963, the trust leased the
property at issue in this case to Oak Park Savings &
Loan Association, later known as Great American.
The ninety-nine-year lease provided that the tenant
was obligated, *inter alia,* to pay monthly rent and to
make "all necessary repairs, renewals and
replacements, interior and exterior, structural and
non-structural."(Indenture of Lease at 8.)

In 1983, Great American negotiated a sublease with
Bernard Bajoras, which provided that Bajoras would
have possession of the property for seventy-nine
years and would "promptly make all necessary
repairs, renewals and replacements, interior and
exterior, structural and non-structural, all at [Bajoras']
sole expense." (Indenture of Sublease at 7.) Bajoras
claims that he later erected improvements on the
property that added to its value.

Great American was declared insolvent and on
September 21, 1990, the RTC was appointed
receiver.[FN2]In April 1991, the RTC repudiated the
lease and sublease pursuant to 12 U.S.C.
§1821(e)(1).[FN3] There is no dispute as to the validity
of the RTC's repudiation of the lease, but Bajoras
protests its repudiation of the sublease.

Plaintiffs claim that prior to being placed in
receivership, Great American defaulted on its
obligations to keep the property in good repair and to
prevent waste and deterioration. According to
plaintiffs, the cost of making the necessary repairs is
$226,215. These costs are alleged to have accrued
prior to the RTC's appointment as receiver. After the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 324578 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1995 WL 324578 (N.D.Ill.))

repudiation, plaintiffs submitted a claim to the RTC for unpaid rent, repair costs, and other expenses. The RTC reimbursed plaintiffs for the unpaid rent and other costs but disallowed the claim for repair costs.

**\*2** Plaintiffs sued in federal district court to collect their repair costs. The RTC moved to dismiss that claim, arguing that 12 U.S.C. §1821(e)(4), a provision of the FIRREA, barred plaintiffs' recovery. We denied that motion on July 1, 1992, holding that "§1821(e)(4) does not prevent recovery of plaintiffs' rehabilitation costs."*Pioneer Bank & Trust v. Resolution Trust Corp.,* 793 F.Supp. 828, 831 (N.D.Ill. 1992).

In October 1992, the RTC filed a third party complaint against Bajoras, asserting that under the sublease Bajoras had the same obligation to repair the property that Great American did. Therefore, the RTC argued, Bajoras should indemnify it for any liability it may have to plaintiffs on their repair costs claim. The RTC's complaint against Bajoras also contained a claim for past-due rent, real estate taxes and assessments, and attorneys' fees.

Bajoras counterclaimed against the RTC and named as additional counterdefendants McCarthy, River Forest, and plaintiffs.[FN4]Bajoras asks the court to declare the RTC's repudiation of the sublease void on constitutional grounds, to restore Bajoras to his position as sublessee, to determine the identity of the current sublessor under the sublease, and to award him attorneys' fees.

Before us now are several motions. Plaintiffs and the RTC have filed cross motions for summary judgment with respect to plaintiffs' claim for repair costs, and the plaintiffs, McCarthy, and River Forest have moved to dismiss Bajoras' counterclaim against them.[FN5]We address the summary judgment motions first, then consider the motions to dismiss.

## DISCUSSION

I. *Cross Motions for Summary Judgment*

A. *Plaintiffs' Motion*

Plaintiffs' motion for summary judgment asks us to hold as a matter of law that Great American breached

its covenant to repair and that that breach left the building in need of more than $225,000 worth of repairs. In response, the RTC argues that plaintiffs have not established a *prima facie* case for breach of the covenant to repair and that even if they had, there would still be a factual dispute over the amount of their damages.[FN6]

We agree with the RTC that the plaintiffs are not entitled to summary judgment. To establish a breach of a covenant to repair, the plaintiffs must show that the lease provision was breached and that they incurred damages as a result. *First National Bank of Des Plaines v. Shape Magnetronics, Inc.,* 90 Ill.Dec. 153, 155 (App.Ct. 1985). We find that there are genuine issues of material fact as to both elements.

Plaintiffs are not entitled to judgment as a matter of law on the liability element because the lease between the plaintiffs and Great American does not clearly set out what Great American's repair obligations are. The covenant to repair requires Great American to make "all necessary repairs, renewals and replacements" on the property, but it does not explain what is meant by "necessary." Thus we cannot tell whether Great American's alleged failure to take certain steps -- such as replacing the HVAC system -- was a breach of the covenant or not. Moreover, as the RTC points out, the lease as a whole indicates that the parties were not very concerned with the condition of the buildings. One provision of the lease allows Great American to leave the property unimproved if it is damaged or destroyed, while another permits it to raze the buildings on the property and construct new ones -- something the parties seemingly expected it to do. The covenant to keep the buildings in good condition is but one clause in a lengthy document whose main focus is the land underlying those buildings. Without clear evidence of what repairs the parties intended Great American to make, and whether they really intended them to be made at all, we refuse to hold as a matter of law that Great American breached the covenant to repair.[FN7]Generally, contract interpretation is especially well suited to summary disposition. But if a contract is ambiguous, its meaning becomes a question of fact for the factfinder. *Dribeck Importers, Inc. v. G. Heileman Brewing Co.,* 883 F.2d 569, 573 (7th Cir. 1989); *see also Betaco, Inc. v. Cessna Aircraft Co.,* 32 F.3d 1126, 1138 (7th Cir. 1994) (summary judgment

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1995 WL 324578 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1995 WL 324578 (N.D.Ill.))**

inappropriate where parties' intent with respect to contract was "subject to contrary assessments"). Because we find that the lease at issue here is ambiguous, we deny the plaintiffs' motion for summary judgment.

**\*3** Even if the contract were not ambiguous and plaintiffs prevailed on the liability issue, they would be entitled only to partial summary judgment because there remains a genuine issue of material fact as to damages. Plaintiffs have not alleged that they expended any money to conduct the repairs they say were necessary. Therefore their damages can be measured only by estimates of what such repairs would have cost.[FN8] Plaintiffs' only evidence of such costs is a report by architect Kenneth Zajac. As the RTC points out, the dollar figures in that report are somewhat speculative. The report was not based on contractors' bids or projected costs for individual components; it was merely a rough estimate attempting "to assess the general conditions of the building and site."(Zajac Report at 4.) In fact, the Report states at page 11 that

[t]he estimates for [repair] work, as described above, are based on cost comparisons with comparable projects that we have observed and industry standards established for the various trades. They are provided for budgetary purposes only. Final pricing can only be achieved by bidding and/or negotiation with the appropriate contractors who will perform the work.

Summary judgment on damages is not appropriate without more concrete evidence of the injury plaintiffs suffered as a result of Great American's alleged misconduct. Plaintiffs' motion is denied.

### B. *The RTC's Motion*

In addition to contesting plaintiffs' motion for summary judgment, the RTC filed a cross motion contending that it is entitled to judgment as a matter of law because (a) plaintiffs' damages resulted from the repudiation of the lease and are therefore barred by 12 U.S.C. §1821(e)(4) ("section 4"); (b) even if 12 U.S.C. §1821(e)(3) ("section 3") governs rather than section 4, plaintiffs are not entitled to damages because section 3 allows only "actual direct compensatory damages" and plaintiffs have not established that it incurred any such costs; (c) the lease did not oblige Great American to make repairs;

(d) even if there was such an obligation, plaintiffs cannot establish that it was breached; and (e) in any event, plaintiffs did not sustain any actual damages.

We begin by rejecting the RTC's statutory arguments. The section 4 argument fails for the reasons we set forth in our July 1, 1992 opinion. *See Pioneer Bank & Trust v. Resolution Trust Corp.,* 793 F.Supp. 828 (N.D.Ill. 1992).[FN9] As for section 3, we agree that plaintiffs cannot recover any money they may have lost when they sold the property in its unrepaired state. But, as explained *supra* at note 8, plaintiffs *can* recover the amount that would have been necessary to put the building in the condition it would have been in had Great American upheld its end of the bargain. Therefore, section 3 does not bar plaintiffs' claim in its entirety.

The RTC's argument that Great American had no obligation to make repairs similarly fails to persuade us to grant summary judgment. The lease explicitly requires Great American to make "all necessary repairs, renewals and replacements, interior and exterior, structural and non-structural."Although (as noted above) there are reasons to believe that the parties' main concern in entering into the lease was the underlying land, not the buildings, those reasons are not sufficient to sustain a grant of summary judgment in the face of the plain language of the covenant to repair. The same contractual ambiguity that defeats plaintiffs' motion for summary judgment is also fatal to the RTC's motion. The meaning of ambiguous contracts is a question of fact for the factfinder. *Dribeck,* 883 F.2d at 573;*Betaco,* 32 F.3d at 1138.

**\*4** The RTC's next argument, that plaintiffs have not established that the obligation was breached, is equally fruitless. As explained in section A above, what the parties intended Great American's repair obligations to be is not clear from the face of the lease nor from the undisputed facts before us. The question is principally one of intent and, when a contract is ambiguous, questions of that sort are best left to a finder of fact. *Dribeck,* 883 F.2d at 573;*Betaco,* 32 F.3d at 1138. Plaintiffs have presented sufficient evidence of breach to survive summary judgment.

Finally, we reject the RTC's assertion that plaintiffs have failed to provide any evidence to support the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 324578 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1995 WL 324578 (N.D.Ill.))

damages element of their claim. The Zajac Report is at least some evidence (however speculative) of what that amount would have been. If liability is imposed, the RTC may attempt to persuade the factfinder that the plaintiffs incurred no damages by criticizing the Zajac Report or by introducing its own estimates of costs, but it is not entitled to summary judgment simply because plaintiffs do not present irrefutable evidence.

## II. *Motions to Dismiss*

Bajoras' third party counterclaim against the RTC names McCarthy, River Forest, and plaintiffs as additional third party defendants. The third party defendants' motions to dismiss assert that Bajoras' complaint does not state a claim upon which relief can be granted. Bajoras responds that the third party defendants are necessary parties to the litigation and therefore must be joined under Fed.R.Civ.P. 19.

We find Rule 19 inapplicable here. Plaintiffs are already parties to the lawsuit and therefore do not need to be "necessary" under Rule 19 in order to be joined, and McCarthy and River Forest did not object to their joinder. Thus we assume that all parties can be joined and proceed to the motions to dismiss.

### A. *Plaintiffs' Motion*

Plaintiffs point out that they were not parties to the sublease between Bajoras and Great American and no longer have any ownership interest in the property in question. Therefore, they say, Bajoras has not stated a cause of action against them. We agree. Bajoras has alleged no wrongdoing on the part of plaintiffs, and the only relief he seeks that could even remotely affect them is his request to be reinstated on the property as a tenant, which might require the rescission of plaintiffs' sale of the property. This court would not grant such a remedy for at least two reasons. First, §1821(e)(3) limits the RTC's liability for repudiating a lease to "actual direct compensatory damages," a term that clearly does not include the equitable relief Bajoras seeks. At most, the RTC would be liable to Bajoras for damages. Second, Illinois law provides that a purchaser of property takes title subject to an existing lease only if the lease is properly recorded or if the purchaser had actual or constructive notice of the lessor's interest. In other words, purchasers are entitled to take title free and

clear of claims of which they lack notice. *Daniels v. Anderson,* 204 Ill.Dec. 666, 671 (Ill. 1994) ("A *bona fide* purchaser is a person who takes title to real property in good faith for value without notice of outstanding rights or interests of others. A *bona fide* purchaser takes such title free of any interests of third parties, except such interests of which he has notice."); *Bezin v. Ginsburg,* 16 Ill.Dec. 595, 602 (App.Ct. 1978) ("It is elementary that a purchaser of an interest in real property takes subject to all validly existing leases *of which he has actual or constructive notice.*") (emphasis added). Here the property changed hands twice after Bajoras' sublease was repudiated and before he challenged the repudiation.[FN10]McCarthy and River Forest (and the people from whom they purchased the property) were entitled to consider the sublease repudiated, and their title is not subject to the sublease.[FN11]Because there is no way Bajoras could recover against plaintiffs or affect their interests in any way, their motion to dismiss his counterclaim for failure to state a claim is granted.

### B. *McCarthy and River Forest's Motion*

**\*5** Like plaintiffs, McCarthy and River Forest have no interest that could be affected by Bajoras' counterclaim. Although they own the land on which Bajoras hopes to be reinstated, we have already rejected reinstatement as a remedy. None of the other relief Bajoras seeks could be awarded against McCarthy and River Forest. They were not parties to the sublease, and Bajoras has alleged no other basis on which they could be held liable. We therefore grant their motion to dismiss.

### CONCLUSION

Both plaintiffs' and the RTC's motions for summary judgment are denied. The motions to dismiss filed by plaintiffs, McCarthy, and River Forest are granted.

> FN1. The facts recited here are undisputed unless otherwise noted.

> FN2. An April 5, 1991 letter from the RTC to plaintiff Panijel indicates that the RTC was appointed receiver of Great American on September 21, 1991. We presume that the correct date is actually September 21, 1990.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                              Page 5
Not Reported in F.Supp., 1995 WL 324578 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1995 WL 324578 (N.D.Ill.))**

FN3. The RTC's repudiation letter to Bajoras is dated February 8, 1991, but Bajoras claims he received it on April 10, 1991. Great American's lease agreement with the plaintiffs was repudiated on April 5, 1991.

FN4. The plaintiffs sold the property to Howard Rushkin and Marvin Lustbadaer on September 20, 1991. Rushkin and Lustbadaer in turn sold to McCarthy and River Forest.

FN5. The third-party dispute between the RTC and Bajoras is also being litigated, but no aspect of that dispute is ripe for resolution at this time.

FN6. The RTC further claims that the lease did not impose on Great American an absolute duty to repair and that the FIRREA bars the plaintiffs' claim for repair costs. It is not necessary for us to address these arguments in order to rule on the plaintiffs' motion for summary judgment, so we do not consider them here. They are discussed in our analysis of the RTC's cross motion for summary judgment. *See infra* part I.B.

FN7. As further evidence that summary judgment is inappropriate, the RTC points out that Pioneer stated in an estoppel certificate dated March 9, 1990 that "to the best knowledge of [Pioneer], no default exists under the Ground Lease on the part of either party thereto."The RTC also claims that various repairs were made over the years and presents the building permits authorizing those repairs. Although these facts are not necessary to our decision, they support our conclusion.

FN8. The plaintiffs' recovery would be limited to the cost of the repairs Great American allegedly failed to make. In other words, the plaintiffs could not recover the difference between (a) their proceeds from the sale of the property in its unrepaired condition and (b) what the property would have been worth had repairs been made.

That figure would most likely represent not only the value of the repairs (*i.e.,* the cost of Great American's breach), but also some measure of profit, in the same way that an upgrade on a home often increases the home's market value by more than the cost of the upgrade. As we noted in our earlier opinion, §1821(e)(3) limits plaintiffs suing the RTC after a repudiation to "actual direct compensatory damages" accruing as a result of prerepudiation actions; "damages for lost profits or opportunity," among other types of damages, cannot be recovered. 12 U.S.C. §1821(e)(3); *see Pioneer,* 793 F.Supp. at 829 n.4, 830. Therefore, we reject the plaintiffs' claim (which is implicit in their submission of an affidavit purporting to establish the property's market value if fully repaired) that the RTC's liability, if proved, could be measured by subtracting the sale price of the property from an estimate of its value if fully repaired.

FN9. Section 4 bars claims for damages that result from the RTC's repudiation of a lease or contract. Here the plaintiffs are claiming damages based on activity (actually inactivity) that took place *before* the RTC repudiated the lease: Great American's failure to keep the property in good repair as required by the lease. Therefore, section 4 does not apply.

FN10. On September 20, 1991, the plaintiffs sold the property to a third party, who in turn sold it to McCarthy and River Forest.

FN11. Two other reasons may support our rejection of Bajoras' reinstatement claim. First, since Bajoras left the property, the buildings' interior has been gutted and converted to a new use. We could not reinstate Bajoras without upsetting the present situation on the property, and that might violate general equitable principles. Second, a sublease can grant a sublessee rights in the leased property only to the extent that the lessor has such rights. *Moran v. Commonwealth Edison Co.,* 30 Ill.Dec. 922, 926 (App.Ct. 1979) ("sublessee plaintiffs ... have only the rights in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 324578 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1995 WL 324578 (N.D.Ill.))**

premises leased as were vested in and possessed by their lessors"); *Wilson Broadway Building Corp. v. Northwestern Elevated Railroad Co.,* 225 Ill.App. 306, 312 (1922) ("[T]he termination of [a] top lease *ipso facto* works a termination of a sublease."). Therefore Bajoras at most has the rights Great American has. Because Great American's lease was repudiated, Bajoras may be left with no claim to possession.

N.D.Ill. 1995

Pioneer Bank & Trust Co. v. Resolution Trust Corp.

Not Reported in F.Supp., 1995 WL 324578 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **EXHIBIT E**

Westlaw.

Not Reported in F.Supp.2d                                                                          Page 1
Not Reported in F.Supp.2d, 2004 WL 2203429 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2203429 (N.D.Ill.))**

TruServ Corp. v. Flegles Inc.
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
TRUSERV CORPORATION f/k/a Cotter &
Company, Plaintiff,
v.
FLEGLES INC, d/b/a Flegles True Value Home
Center and Alice Mae Flegle, Defendants.
**No. 03 C 3284.**

Sept. 29, 2004.

David Joel Chizewer, James P. Madigan, Goldberg,
Kohn, Bell, Black, Rosenbloom & Moritz, Ltd.,
Chicago, IL, for Plaintiff.
Richard Jerold Hoskins, Patricia J. Thompson, Heidi
Kern Oertle, Schiff Hardin LLP, Chicago, IL, Jim L.
Flegle, Loewinsohn & Flegle L.L.P., Dallas, TX, for
Defendants.

*MEMORANDUM OPINION*

DERYEGHIAYAN, J.
*1 This matter is before the court on Plaintiff
TruServ Corporation's ("TruServ") request for
damages from defendants Flegles, Inc. and Ms. Alice
Mae Flegles (collectively "Defendants"). For the
reasons stated below, we rule in favor of TruServ
against Defendants and award $77,149.27 in
damages, $5,143.28 in prejudgment interest,
$50,374.50 in attorney's fees, and $10,879.72 in
costs, totaling $143,546.77.

BACKGROUND

On or about January 20, 2000, TruServ, as a
company, and Flegles, Inc. ("Flegles"), as a retail
member, entered into a written agreement entitled
"Retail Member Agreement with TruServ
Corporation an Independent Retailer Cooperative"
("Member Agreement"). The Member Agreement
governed the relationship between TruServ and
Flegles and allowed Flegles, as a retail member, to
purchase merchandise and services from TruServ for
amounts stated in the member's statements of

accounts ("Members Statements") for Flegles.
According to the terms of the Member Agreement, it
was agreed to by TruServ and Flegles that Illinois
law would govern the Member Agreement. On
February 18, 2003, pursuant to the Member
Agreement TruServ terminated Flegles as a member
for nonpayment of outstanding debt owed to TruServ.

On May 16, 2003, TruServ filed a three count
complaint against Defendants in this court. In Count
I, TruServ contended that Flegles breached the
Member Agreement. In Count II, TruServ contended
that Flegles was liable pursuant to the Member
Agreement for an account stated claim. In Count III,
TruServ contended that Ms. Alice Mae Flegle
("Ms.Flegle") breached three separate guaranty
agreements ("Guaranty Agreements") that she
executed which guaranteed to TruServ the payment
"of any indebtedness or balance of any past, present,
or future indebtedness ...." that Flegles owed to
TruServ. TruServ moved for summary judgment on
all counts.

On July 21, 2004, in a memorandum opinion, we
granted TruServ's motion for summary judgment on
Counts I and III. In addition, we denied TruServ's
motion for summary judgment as to Count II and
dismissed Count II as moot. Because at summary
judgment the parties had not sufficiently briefed the
damages issue, including any applicable set-offs,
attorney's fees, and costs, we ordered the parties to
submit briefing on damages.

DISCUSSION

*I. Contract Damages*

On May 16, 2003, TruServ requested damages from
Defendants for breach of contract in the amount of
$78,627.04, exclusive of interest, costs, and attorney's
fees. The $78,627.04 amount was based on a May 1,
2003 TruServ Members Statement for Flegles. Pl.'s
Ex. A. Since that time, TruServ, in accordance with
the Member Agreement, has applied amounts owed
to Flegles. These amounts include credits for
merchandise applied to Flegles' account balance and
services, as well as notes payable by TruServ to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2203429 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2203429 (N.D.Ill.))**

Flegles which have now become due since Flegles' termination as a member. On March 1, 2004, TruServ issued a new Members Statement for Flegles that reflected these new amounts applied, with a reduced balance of $78,174.81 owed to TruServ. Pl.'s Ex. A. Additionally, the Members Statement dated March 1, 2004 contained a detailed list of the transactions between TruServ and Flegles, along with a clearly itemized account of the amount owed to TruServ by Flegles for any and all of the merchandise, advances, and services that TruServ provided or caused to be provided for Flegles.

**\*2** Defendants argue that the $78,174.81 stated in the March 1, 2004 Members Statement should also credit Flegles with a $1,025.54 patronage dividend check ("Dividend Check") that TruServ sent to Flegles, but that Flegles returned to TruServ without cashing. There is no dispute that the $1,025.54 reflected in the Dividend Check belongs to Flegles. The court notes that TruServ has already applied other amounts and credits owed to Flegles which have become due since Flegles termination as a member. TruServ did not exercise its right under the Member Agreement to place a lien on the patronage dividend, but instead mailed the dividend check to Flegles which was then returned to TruServ. Under these facts, there is no reason whatsoever that the $1,025.54 should not also be applied as a credit. Therefore, we find that as a result of Flegles' breach of the Member Agreement, TruServ has been damaged in the amount of $77,149.27.

*II. Prejudgment Interest, Attorney's Fees, and Costs*

TruServ maintains that pursuant to the Member Agreement, it is entitled to prejudgment interest, attorney's fees, and costs. We agree. The Member Agreement provides:

"In the event that the Company initiates proceedings to recover amounts due it by Member or for any *breach* of this agreement to seek equitable or injunctive relief against the Member, the Company shall be entitled to the recovery of all *associated costs, interest,* and *reasonable attorney's fees.* "(emphasis added)

Pl.'s Ex. A.

*A. Prejudgment Interest*

TruServ and Flegles agree that under Illinois law, prejudgment interest applies at the rate of 5% per annum as prescribed by the Illinois Interest Act. 815 ILCS 205/2. Specifically, 815 ILCS 205/2 provides:

Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance; on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment. In the absence of an agreement between the creditor and debtor governing interest charges, upon 30 days' written notice to the debtor, an assignee or agent of the creditor may charge and collect interest as provided in this Section on behalf of a creditor.

815 ILCS 205/2.

Further, under Illinois law, in order for a court to award prejudgment interest, the actual amount due must be a "liquidated amount or subject to easy computation."*Ameritech Information Systems, Inc. v. Bar Code Resources, Inc.,* 331 F.3d 571, 575 (7th Cir.2003).

We have found that the actual amount of damages as a result of Flegles' breach is $77,149.27. TruServ terminated Flegles as a member on February 18, 2003 for breach of the Member Agreement. Defendants argue that TruServ has already charged Flegles interest as a "service charge" on the amount due from the date Flegles was terminated up to and including March 14, 2003. TruServ has not disputed this contention. Accordingly, Flegles should not be charged prejudgment interest for that period prior to March 14, 2003. As such, TruServ is entitled to prejudgment interest on the amount of $77,149.27 from March 14, 2003 until July 21, 2004, the date of entry of judgment in this action. *See Ameritech,* 331 F.3d at 575 (stating that statutory interest, under Illinois law, "can be recovered at the discretion of the court"). Therefore, in applying the rate of 5% to $77,149.27, we find that TruServ is entitled to $5,143.28 in prejudgment interest.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2203429 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2203429 (N.D.Ill.))

## B. Attorney's Fees

**\*3** In its request for attorney's fees, TruServ has submitted exhibits and a detailed affidavit which set forth the hours spent and rates the attorneys charged in this litigation. Pl.'s Ex. B. Based on these exhibits, TruServ contends that the appropriate amount of attorney's fees that it should be awarded totals $58,339.50. Defendants maintain that TruServ's request is unreasonable and that TruServ is entitled to attorney's fees of no more than $16,000.

The Seventh Circuit Court of Appeals has stated that a request for attorney's fees "can turn a simple civil case into two or even more cases-the case on the merits, the case for fees, the case for fees on appeal, the case for fees proving fees, and so on ad infinitum, or at least ad nauseam." *See Divane v. Krull Electric Co.,* 319 F.3d 307, 314, (7th Cir.2003)(quoting *Ustrak v. Fairman,* 851 F.2d 983, 987 (7th Cir.1988). In determining whether to grant a request for attorney's fees to a prevailing party, Illinois Courts have applied the factors set forth by the United States Supreme Court in *Hensley v. Eckerhart,* 461 U.S. 424, 434-37, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).*Cannon v. William Chevrolet/GEO, INC.,* 341 Ill.App.3d 674, 276 Ill.Dec. 593, 794 N.E.2d 843, 852-855, (2003); *Cress v. Recreation Services,* 341 Ill.App.3d 149, 277 Ill.Dec. 149, 795 N.E.2d 817, 855-56, (2003). In *Hensley,* the Supreme Court instructs a court to determine the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."461 U.S. at 433. In addition, a court must decide whether the prevailing party's claims were separate and unrelated or whether they involved a "common core of facts" that were based on "related legal theories ." *Id.* at 434-35.Ultimately, a court must examine the success of the litigation by considering the "results obtained," and where it is established that a prevailing party has obtained "excellent results, his attorney should recover a fully compensatory fee."*Id.*

In the instant case, the claims of TruServ all involved the same common core of facts and are based on the same legal theories. Namely, that Flegles breached the Member Agreement and that Flegles and Ms. Flegle were liable to TruServ as a result of that breach. Additionally, TruServ's litigation was successful inasmuch as TruServ established its claims

for breach of contract and breach of personal guaranties. Further, we find that based on the nature of this case and the experience of the attorneys involved, the hourly attorney rates that TruServ was charged, as manifested in the affidavit of attorney David J. Chizewer, are reasonable.

We note that when TruServ filed its motion for summary judgment on March 22, 2004, TruServ's Rule 56.1 Statements reflected that its request for attorney's fees was $43,922.00. Pl.'s Ex. A. TruServ's latest request maintains that its attorney's fees have increased to $58,339.50. The increased request of attorney's fees by TruServ appears to be based on hours related to the filing of TruServ's reply brief in support of its motion for summary judgment and for the additional briefing on damages. However, the court notes that the additional briefing relating to damages was ordered by the court due to the insufficient briefing on that issue by the parties at the summary judgment motion stage. Given the above facts, a request for an increase in attorney's fees with respect to the additional briefing on damages would not be reasonable. Accordingly, we find that TruServ's earlier request of $43,922.00 should only increase by $6,452.50 to account for the attorney's fees charged after March 22, 2004 that relate to the hours spent preparing for the filing of TruServ's reply brief in support of its motion for summary judgment. Therefore, TruServ is entitled to $50,374.50 in attorney's fees which we find to be reasonable.

## C. Costs

**\*4** In its request for costs, TruServ has submitted exhibits and a detailed affidavit which itemizes all of the costs and expenses TruServ has incurred in this litigation. TruServ contends that the appropriate amount of costs totals $10,879.72. Defendants contend that TruServ's request is unreasonable and that their own counsel has incurred a legal cost for less than that requested by TruServ. We disagree. Based upon the facts and the costs TruServ has incurred, we cannot find that TruServ's request is unreasonable. Therefore, this court finds that TruServ is entitled to $10,879.72 in costs.

## III. Set-Offs

Defendants argue that Flegles is entitled to a set-off for any TruServ stock it owns. Specifically,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2203429 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 2203429 (N.D.Ill.))

Page 4

Defendants request that a specific amount in TruServ stock that Flegles owns be set-off and deducted from the amount of judgment entered by this court. However, Defendants' request is without merit. Defendants have failed to establish how, under the terms of the Member Agreement, they are entitled to an immediate set-off in this judgment of any TruServ stock it owns. The Member Agreement provides that TruServ:

"... shall have a lien on and a right of setoff against any stocks or notes ..."

Pl.'s Ex. A. In addition, we note that Defendants themselves have attached to their Memorandum in Opposition to TruServ's Request for Damages ("Opposition") a document dated August 12, 2004 from TruServ to Flegles, which provides in part:
"Upon redemption of Flegles' stock, TruServ will issue a five-year note payable in the amount of $20,153.34. Flegles will receive notice of issuance of that note by August 31, 2004, with the first payment of principal and interest on December 31, 2004."

Opposition at Ex. 2. TruServ has indicated that it will issue Flegles a five-year note payable in the amount of $20,153.34 based on Flegles current Securities Account with TruServ. *Id.* Therefore, we find that Defendants have failed to establish that Flegles is entitled to any set-off in this litigation for any TruServ stock it owns.

## CONCLUSION

Therefore, based on the forgoing, we rule in favor of TruServ against Defendants and award $77,149.27 in damages, $5,143.28 in prejudgment interest, $50,374.50 in attorney's fees, and $10,879.72 in costs, totaling $143,546.77.

N.D.Ill.,2004.
TruServ Corp. v. Flegles Inc.
Not Reported in F.Supp.2d, 2004 WL 2203429 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **<u>EXHIBIT F</u>**

Westlaw.

Not Reported in F.Supp.                                                      Page 1
Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.))**

▷

Taylor v. Bekins Van Lines, Co.
N.D.Ill.,1996.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Peggy TAYLOR, Plaintiff,
v.
BEKINS VAN LINES, CO., Defendant.
**No. 95 C 2886.**

Jan. 12, 1996.

### MEMORANDUM OPINION AND ORDER

CONLON, District Judge.
**\*1** Plaintiff Peggy Taylor sues defendant Bekins
Van Lines, Co. ("Bekins") for breach of contract,
discharge in violation of the Employee Retirement
Income Security Act of 1974 ("ERISA"), 29 U.S.C.
§ 1001 *et seq.,* and intentional infliction of emotion-
al distress. Bekins moves for summary judgment.
Taylor cross-moves for partial summary judgment.

### BACKGROUND

The following facts are uncontested unless other-
wise noted. Bekins is a national moving company
engaged in intrastate, interstate and international
transportation of household goods and specialty
distribution services. Bekins' headquarters are loc-
ated in Hillside, Illinois. Defendant's Local Rule
12(M) ( "Def. 12(M)") and Plaintiff's Local Rule
12(N) ("Pl. 12(N)") ¶ 1.

### I. *THE 1981 HANDBOOK*

Bekins hired Taylor in August 1981 as a file clerk.
Def. 12(M) and Pl. 12(N) ¶ 2. Upon her hire,
Taylor received a Bekins employee handbook.
Plaintiff's Local Rule 12(M) ("Pl. 12 (M)") ¶ 1; *see*
Plaintiff's Exhibit ("Pl. Ex.") 4; Affidavit of Peggy

Taylor ("Taylor Aff.") ¶ 1. The 1981 handbook's
leave of absence policy generally provided unpaid
leave for up to three months for illness, injury or
expected childbirth. Pl. Ex. 4 at 4.

In May 1990, Taylor was promoted to coordinator
dispatcher, a non-exempt position. Def. 12(M) and
Pl. 12(N) ¶ 2. As the coordinator dispatcher, Taylor
was responsible for scheduling shipments and dis-
patching drivers. *Id.*

### II. *THE 1991 HANDBOOK*

In 1991, Taylor was given and instructed to read a
revised Bekins employee handbook. Def. 12(M)
and Pl. 12(N) ¶ 3. Taylor signed an acknowledge-
ment that she received the 1991 handbook. *Id.* at ¶
4. The acknowledgement Taylor allegedly signed
stated:

I hereby acknowledge receipt of The *Bekins and
You* Handbook. The information in this handbook is
subject to change as situations warrant and I under-
stand that such changes in the policy may super-
sede, modify or eliminate the policies summarized
in this booklet. I understand that nothing in this
handbook constitutes a contract of employment,
and that my employment with Bekins may be ter-
minated at any time.

Def. 12(M) ¶ 4; Deposition of Peggy Taylor
("Taylor Dep.") Ex. 3. The acknowledgement form
Bekins proffers is not signed by Taylor. *See* Taylor
Dep. Ex. 3. Taylor stated in her deposition that the
unsigned acknowledgement form was an accurate
copy of the form she was required to sign when she
received the 1991 handbook. Taylor Dep. at 15;
Taylor Dep. Ex. 3. Taylor attests she repeatedly re-
quested Bekins to produce a copy of the 1991 ac-
knowledgement form with her signature; Bekins
never produced the signed form. *See* Taylor Aff. at
¶ 30. In a post-deposition affidavit, Taylor attests
she no longer recalls the contents of the form she
signed. *Id.* at ¶ 31.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2
Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.))

The 1991 handbook contains a more detailed medical leave of absence policy than the 1981 handbook. The 1991 handbook allows leave due to illness, injury or expected childbirth. Taylor Dep. Ex. 2 at 23. The leave policy provides as follows:

**\*2** A request must be made in writing to Human Resources as soon as the employee becomes aware that he/she will require a medical leave. A physician's statement will also be required stating the reason, the commencement date and anticipated duration of the disability. If a Medical Leave is required during an employee's first 90 days, termination of employment may be elected and the employee allowed to re-apply once he/she is medically released to full duty. The maximum duration of a leave is ... up to one year for over 10 years of service starting from the last day worked.

*Note:* The company may require periodic verification from the doctor of the employee's inability to work....

... An employee is required to return to work as soon as he/she is medically able to do so, and if the return is within 90 days, he/she will be reinstated in either the former position or one of similar responsibility and salary within the department. Bekins reserves the right to replace any open position due to business necessity.

If a leave of absence extends beyond the 90 day period, a request for an extension will be necessary. After the 90 day period, the employee's position will not be guaranteed. An employee returning after 90 days would be eligible to apply for any other available positions within the company and will be considered with any other candidates based on qualifications.

At the expiration of the leave of absence, if an employee fails to return to work it will be deemed that he/she voluntarily resigned.

Taylor Dep. Ex. 2 at 23.

Bekins' human resources manager, Betsy Rhinesmith, attests medical leave extensions are permitted beyond 90 days solely to allow employees to maintain their health insurance benefits during periods of extended disability. Def. 12(M) ¶ 8(a); Affidavit of Betsy Rhinesmith ("Rhinesmith Aff.") at ¶ 9. While on extended medical leave, Bekins continues to pay its share of premiums for the employee's health insurance coverage offered through Bekins. Def. 12(M) and Pl. 12(N) ¶ 8(b); Rhinesmith Aff. at ¶ 9. Taylor contends the 1991 handbook does not condition long term leaves of absence on medical coverage. Pl. 12(N) ¶ 8(a). It is uncontested Taylor was not covered by Bekins' health insurance plan. Taylor Dep. at 8-9.

Rhinesmith further attests if a Bekins employee is rehired, then the employee's past seniority is preserved if the length of time the employee was off work was less than the employee's prior term of employment with the company. Rhinesmith Aff. at ¶ 11. Taylor contends no written policy supports Rhinesmith's statement, nor was Taylor aware of this purported policy to preserve seniority. Pl. 12(N) ¶ 10; Taylor Aff. at ¶ 37. Taylor believed long term leave preserved seniority while termination did not. *Id.*

The 1991 handbook also includes a short-term disability policy. Def. 12(M) and Pl. 12(N) ¶ 11; Taylor Dep. Ex. 2 at 21. Under the company's policy, short-term disability payments "will begin ... after 10 consecutive work days of illness."Taylor Dep. Ex. 2 at 21; Def. 12(M) and Pl. 12(N) ¶ 11. All sick days must be used before short-term disability payments begin. Def. 12(M) and Pl. 12(N) ¶ 11; Rhinesmith Aff. at ¶ 12. Taylor was entitled to six sick days as a non-exempt employee. Def. 12(M) and Pl. 12(N) ¶ 11.

**\*3** While Taylor was employed with Bekins, employees with more than 10 years of service were entitled to receive a maximum of three months of short-term disability. Def. 12(M) and Pl. 12(N) ¶ 12(a). The three months consisted of eight weeks of full salary and four weeks at 60 percent salary.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3
Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.))**

Taylor Dep. Ex. 2 at 21.

Rhinesmith attests Bekins always applied the short-term disability policy, so the three-month period begins on the first day of illness, not the first day for which short-term disability benefits are paid. Rhinesmith Aff. at ¶ 13. Short-term disability is designed to fill the gap between sick days and long-term disability. *Id.* Rhinesmith further attests after being off work for 90 days, an employee becomes eligible for long-term disability. *Id.* Taylor disputes Rhinesmith's affidavit and attests her understanding of short-term disability to be a three-month benefit commencing ten days after the onset of illness. Taylor Aff. at ¶ 27. Taylor contends an employee becomes eligible for long-term disability after she is on short-term disability for 90 days. Taylor Aff. at ¶ 28.[FN1]

### III. *TAYLOR'S ILLNESS AND DISCHARGE*

Taylor has been an insulin-dependent diabetic for the past 20 years. Def. 12(M) and Pl. 12(N) ¶ 13. Taylor attests the company was not aware of her diabetes until January 1, 1993. Taylor Aff. ¶ 48. Taylor's last day of work was December 18, 1992. Def. 12(M) and Pl. 12(N) ¶ 23. Taylor was scheduled to be on vacation between December 18, 1992 and January 4, 1993. *Id.* at ¶ 14.She developed a diabetic-related foot infection at the end of December 1992. *Id.* at ¶ 15.She called her supervisor on January 1, 1993 and informed him that she was in the hospital and was scheduled to undergo surgery on January 4, 1993.*Id.* at ¶ 16.Taylor called Bekins again on January 4 to inform the company of her impending surgery and advise Bekins she did not know when she would be able to return to work. *Id.* at ¶ 17.

Bekins received a January 5, 1993 letter from Taylor's physician, Dr. Rodney M. Stuck, stating Taylor needed to be off work for one month for care of her foot infection. *Id.* at ¶ 18; Rhinesmith Aff. Ex. 1. Bekins received a January 28, 1993 letter from Dr. Stuck, advising that Taylor needed to

be off work until the second week of March for her foot problem. Def. 12(M) and Pl. 12(N) ¶ 19; Rhinesmith Aff. Ex. 2.

In February 1993, Bekins sent Taylor a letter setting forth the terms of her medical leave of absence. Def. 12(M) and Pl. 12(N) ¶ 25; Taylor Dep. Exs. 6, 7. The letter states:

If you are still medically unable to return to work ... after the above stated 90 days, an extension to your leave of absence *will be granted,* based on your length of service with the company (see following paragraph) ....

The maximum duration of a leave of absence starting from the last day worked is: ... up to one year for over 10 years of service. If, at the expiration of your [leave of absence], you do not or are unable to return to Bekins, your employment will be terminated ....

**\*4** Taylor Dep. Ex. 6 at 1-2 (emphasis added).

Bekins received a March 1, 1993 letter from Dr. Stuck stating Taylor needed to be off work for at least another month because of the foot infection. Def. 12(M) and Pl. 12(N) ¶ 20; Rhinesmith Aff. Ex. 3. Bekins received a March 19, 1993 letter from Dr. Stuck declaring Taylor needed to be off work at least until the end of April 1993 because of her foot infection. Def. 12(M) and Pl. 12(N) ¶ 21; Rhinesmith Aff. Ex. 4.

In a letter dated April 9, 1993, Rhinesmith notified Taylor her employment was terminated effective April 4, 1993, because her medical leave of absence exceeded 90 days and Bekins needed to fill Taylor's position due to business necessity. Def. 12(M) and Pl. 12(N) ¶¶ 22, 26; Taylor Dep. Ex. 5; Rhinesmith Aff. ¶ 19; Taylor Dep. at 36. Rhinesmith attests Bekins considered Taylor to be on a medical leave of absence as of January 5, 1993. Rhinesmith Aff. at ¶ 18. Taylor denies Rhinesmith's affidavit and states there are no contemporaneously written documents verifying January 5, 1993 as the first day of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                   Page 4
Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.))**

Taylor's leave of absence. Pl. 12(N) ¶ 24. Taylor understood her medical leave began 10 business days after January 5, 1993. *Id.*

Rhinesmith's April 9 letter advised Taylor she could reapply for another position and would be considered along with other candidates. Taylor Dep. Ex. 5. The letter did not mention Taylor's seniority would be preserved if she reapplied.

Bekins claims Taylor received short-term disability benefits between January 1993 and early April 1993, the period of her medical leave of absence. Def. 12(M) ¶ 29; Taylor Dep. at 43-44. Taylor contends she received short-term disability payments from January 19, 1993 until April 4, 1993. Pl. 12(N) ¶ 29; Taylor Aff. ¶ 27. Taylor claims she was on vacation through January 4, 1993. Taylor Aff. ¶ 25. She received sick day payments on January 5-9, 1993 and January 12, 1993. *Id.* She took unpaid sick days on January 13-16, 1993.*Id.* at ¶ 26.

Taylor never personally requested an extension of her medical leave of absence. Def. 12(M) and Pl. 12(N) ¶ 30; Taylor Dep. at 57. After she received Rhinesmith's April 9, 1993 termination letter, Taylor did not contact anyone at Bekins. Def. 12(M) and Pl. 12(N) ¶ 32; Taylor Dep. at 57-58. Taylor claims her doctor verified her need for an extended medical leave of absence in his March 19, 1993 letter stating Taylor needed to be off work at least until the end of April 1993 for a foot problem. Pl. 12(N) ¶ 30. Taylor was released to return to full duty by Dr. Stuck at the end of October 1993. Def. 12(M) and Pl. 12(N) ¶ 31. Taylor did not talk to anyone at Bekins about the possibility of returning to work. Taylor Dep. at 35.

Taylor was a participant in Bekins' long-term disability insurance plan (the "plan"). Def. 12(M) and Pl. 12(N) ¶ 33; Taylor Dep. Ex. 14. Plan contributions are made solely by the employee-participant through paycheck deductions. Def. 12(M) and Pl. 12(N) ¶ 33. Rhinesmith attests Bekins does not contribute any funds to the plan, but assumes all administrative costs. Rhinesmith Aff. at ¶ 20. Bekins

sent Taylor an application for long-term disability benefits under its plan. Def. 12(M) and Pl. 12(N) ¶ 34. Taylor claims she did not receive the application until after filing an Equal Employment Opportunity Commission ("EEOC") complaint alleging disability discrimination. Taylor Aff. at ¶ 9. While Taylor received long-term disability benefits for the April 1993 to October 1993 time period, she did not receive those benefits until September 9, 1994, after this lawsuit commenced. Taylor Dep. Ex. 11; Affidavit of Tamara L. Kramer ("Kramer Aff.").

**\*5** Rhinesmith attests Taylor's diabetes and medical leave of absence did not play a role in Bekins' decision to terminate Taylor's employment. Rhinesmith Aff. ¶ 19. Taylor contends Rhinesmith was not the decision maker; Andrea Rios and Audrey Jackel allegedly decided to discharge Taylor. Pl. 12(N) ¶ 28.

*DISCUSSION*

I. *SUMMARY JUDGMENT STANDARDS*

Bekins moves for summary judgment under Fed. R. Civ. P. 56. A movant is entitled to summary judgment under Rule 56 when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Unterreiner v. Volkswagen of America, Inc.,* 8 F.3d 1206, 1209 (7th Cir. 1993). Once a moving party meets its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole, and draws all reasonable inferences in the light most favorable to the party opposing the motion.*Fisher v. Transco Services-Milwaukee, Inc.,* 979 F.2d 1239, 1242 (7th Cir. 1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return

Not Reported in F.Supp.                                                                                    Page 5
Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.))

a verdict for the nonmoving party."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Stewart v. McGinnis,* 5 F.3d 1031, 1033 (7th Cir. 1993), *cert. denied.*114 S. Ct. 1075 (1994). This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir. 1993). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)."The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."*Anderson,* 477 U.S. at 252.

## II. *TAYLOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT*

In Count I of her complaint, Taylor claims Bekins breached its employment contract by failing to place her on a long-term medical leave of absence when her short-term disability leave ended. Taylor seeks partial summary judgment on the issue of whether Bekins' handbooks created a binding contract.

Rule 56(c) of the Federal Rules of Civil Procedure permits summary judgment on the issue of liability as to at least a single claim. *See Capitol Records, Inc. v. Progress Record Distributing, Inc.,* 106 F.R.D. 25, 30 (N.D. Ill. 1985)."To hold that judgment could be entered and an appeal taken on part of a claim would result in bifurcated proceedings that could only delay unnecessarily the progress of the litigation."*Id.* at 28.Neither do Rules 56(a) and (b) permit piecemeal litigation. *See Arado v. General Fire Extinguisher Corp.,* 626 F. Supp. 506, 509 (N.D. Ill. 1985). To allow motions for summary judgment on only a portion of a claim "would contravene the purposes of [a] motion for summary judgment, namely judicial efficiency."*LaSalle Nat'l Bank v. Massachusetts Bay Ins. Co.,* No. 90 C

2005, 1992 WL 265853, at *2 (N.D. Ill. Sept. 30, 1992).Rule 56(d) provides that a court may enter an order specifying facts that appear without substantial controversy. However, there is no Rule 56(d) motion for summary judgment. *See Arado,* 626 F. Supp. at 509;*SFM Corp. v. Sundstrand Corp.,* 102 F.R.D. 555, 558 (N.D. Ill. 1984)."Issue-narrowing under Rule 56(d) is merely the by-product of an unsuccessful motion for summary judgment properly brought under Rule 56(a) or (b)."*Capplanco Eleven, Inc. v. Xerox Corp.,* No. 88 C 9565, 1990 WL 16469, at *3 (N.D. Ill. Jan. 26, 1990).

**\*6** Taylor improperly seeks partial summary judgment that an employment contract existed between the parties. The court may not narrow the issues for trial under Rule 56(d) unless Taylor's partial summary judgment motion could dispose of an entire claim -- *i.e.,* whether Bekins breached a contract when it discharged Taylor rather than place her on a long-term leave of absence. Accordingly, the court denies Taylor's motion for partial summary judgment, but will consider her arguments in opposition to Bekins' summary judgment motion on the breach of contract claim.

## III. *BREACH OF EMPLOYMENT CONTRACT*

Bekins moves for summary judgment on Taylor's breach of contract claim. Bekins asserts the 1991 handbook contained a clear disclaimer and that Taylor was fully aware of the disclaimer. Even if the handbook constituted an enforceable contract, Bekins contends Taylor's leave and termination were handled as required by the handbook. Taylor claims the 1981 and 1991 handbook constituted an enforceable contract. She denies the 1991 handbook contained a clear disclaimer and that she was aware of any disclaimer.

The nature of employment relationships and the creation of an enforceable contract are matters of Illinois law. Generally, an employment relationship of unspecified duration is presumed terminable at will by either party.*Robinson v. Ada S. McKinley*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 6
Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.))**

*Community Services,* 19 F.3d 359, 360 (7th Cir. 1994) (citing *Duldulao v. St. Mary of Nazareth Hospital Center,* 505 N.E.2d 314, 317 (Ill. 1987)); *Belline v. K-Mart Corp.,* 940 F.2d 184, 186 (7th Cir. 1991). In Illinois, an employee handbook can create an enforceable contract if traditional contract formation requirements are present. *Robinson,* 19 F.3d at 360;*Belline,* 940 F.2d at 189;*Duldulao,* 505 N.E.2d at 318. To create an enforceable contract, all three of the following requirements must be met:

(1) the handbook's language must contain a clear promise so that an employee would reasonably believe an offer was made;

(2) the handbook must be disseminated to the employee so she is made aware of its contents and reasonably believes it to constitute an offer; and

(3) the employee accepts the offer by commencing or continuing to work after learning of the handbook's language.

*Robinson,* 19 F.3d at 361;*Belline,* 940 F.2d at 189;*Duldulao,* 505 N.E.2d at 318. An employee's execution of a clearly worded disclaimer may prevent the contract's formation. *See Boulay v. Impell Corp.,* 939 F.2d 480, 483 (7th Cir. 1991); *Hultquist v. Hartman,* No. 94 C 424, 1995 WL 519979, at **4-5 (N.D. Ill. Aug. 30, 1995) (attached as Def. Ex. 1) (citing *Anders v. Mobil Chem. Co.,* 559 N.E.2d 1119 (Ill. App. Ct. 1990)).

At issue is whether Bekins created an enforceable contract regarding employee leaves of absence. Taylor notes the 1981 handbook did not contain a disclaimer. However, the 1981 handbook does not create a binding contract. The handbook's leave of absence policy does not contain a clear promise. The policy states an employee "may" request a temporary disability leave. Pl. Ex. 4 at 4. "If" the leave of absence extends beyond three months, an employee's return to work "depends" on availability of a position. *Id.* This language is suggestive, not mandatory; it neither guarantees a temporary disability leave nor an employee's return to work. *See*

*Boulay,* 939 F.2d at 482. Taylor argues that language stating, "we deem it our obligation to ... [p]rovide security and peace of mind through quality supervision, steady employment, and sound employee benefits" in the Bekins creed creates a binding promise. *See* Pl. Ex. 4. However, the company creed does not state a clear promise of indefinite employment. Nor does it address the leave policy at issue. Accordingly, the 1981 handbook did not create a binding employment contract.

**\*7** Bekins argues the 1991 handbook does not create a binding contract because it contained a clearly-worded disclaimer. The handbook's table of contents shows the acknowledgement is located at page 33 of the handbook. Taylor Dep. Ex. 2. The acknowledgement contains a clearly-worded disclaimer: "The information in this handbook is subject to change ... [that] may supersede, modify or eliminate the policies summarized in this booklet ... nothing in this handbook constitutes a contract of employment ... my employment with Bekins may be terminated at any time."Taylor Dep. Ex. 3. When Taylor received the handbook at a group meeting, the employees were told to read the handbook thoroughly and sign and return the acknowledgement form. Taylor Dep at 15-16.

Taylor responds by questioning the authenticity of the unsigned acknowledgement form Bekins submits. She points out it contains different typeface than the 1991 handbook. Taylor's argument is unpersuasive. She stated at her deposition that she received a copy of the acknowledgement form. Taylor attests she signed an acknowledgement form. Taylor Aff. at ¶ 31. She does not raise a genuine issue of material fact by attesting she no longer recalls the contents of the acknowledgement form. The disclaimer negates any contractual expectations. *See Boulay,* 939 F.2d at 483.

Taylor further argues the Seventh Circuit's decision in *Robinson* is controlling and prevents Bekins from unilaterally modifying the 1981 handbook. In *Robinson,* an initial handbook constituted an enforceable contract because it contained a mandatory

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 7
Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.))**

disciplinary process providing "sufficiently compulsory and definite terms that an employee would reasonably believe that an offer of something other than at-will employment had been made."*Robinson,* 19 F.3d at 362. The court held the employer could not modify the initial handbook by unilaterally issuing a disclaimer with a revised handbook. *Id.* at 364.The court reasoned the plaintiff's continued employment did not constitute consideration because she continued working under the terms of the original handbook, not the revised handbook. *Id.*

*Robinson* is distinguishable. The 1981 handbook does not contain compulsory or definite terms and, therefore, did not create an enforceable contract. Because Taylor did not have expectations of indefinite employment, continuing to work after receiving the 1991 handbook and disclaimer constituted consideration. In *Curtis 1000, Inc. v. Suess,* 24 F.3d 941 (7th Cir. 1994), the Seventh Circuit explicitly distinguished *Robinson.*In *Curtis 1000,* because the plaintiff remained terminable at-will, continuing to employ him after he signed a successive version of an employment policy -- a covenant not to compete -- constituted consideration; the plaintiff received the expectation of continued employment. *Id.* at 947.The continued employment was not worthless simply because it was uncertain. *Id.*

**\*8** *Curtis 1000,* rather than *Robinson,* controls this case. Thus, Taylor accepted Bekins' unilateral modification to its previous handbook by continuing her employment after signing the acknowledgment. The clearly-worded disclaimer prevents the formation of a binding contract. Accordingly, Bekins' motion for summary judgment on the breach of contract claim must be granted.

IV. *ERISA*

Bekins removed this case from the Circuit Court of Cook County because the complaint implicitly raised an ERISA cause of action. Taylor never amended her complaint to state specific ERISA causes of action. Although discovery closed several

months ago, Taylor announces she intends to file an amended complaint to articulate the ERISA claims. Pl. Memorandum at 20 n.12. Taylor claims Bekins violated ERISA sections 510 and 404. The Section 510 claim is addressed in Bekins' summary judgment motion. Section 404 imposes fiduciary responsibilities on ERISA plan administrators to provide benefits to participants with care, skill and diligence. Taylor claims Bekins violated its fiduciary duties by deliberately failing to forward her long-term disability claim to the insurer for 15 months because she filed an EEOC charge. Bekins does not move for summary judgment on the section 404 claim.

Bekins asserts it did not violate section 510 by terminating Taylor rather than extending her leave of absence status. Bekins argues it did not intend to interfere with her ERISA rights or to punish her for exercising her ERISA rights. Bekins further contends Taylor's termination did not constitute an adverse action affecting her ERISA rights. Finally, Bekins maintains Taylor's future entitlement to long-term disability benefits was not a factor in the termination decision; her termination was a straightforward application of the policies contained in the 1991 handbook.

Section 510 makes it unlawful for an employer:

... to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan ....

29 U.S.C. § 1140. Section 510 protects employment relationships from disruptions "designed to frustrate the vesting of benefit plan rights or the continued enjoyment of rights already vested but yet to be partaken."*Teumer v. General Motors Corp.,* 34 F.3d 542, 544 (7th Cir. 1994). Only changes in employment status cannot stem from benefit-based motivations. *Id.* at 545.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                           Page 8
Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.))**

Taylor's section 510 retaliation claim is governed by the Title VII burden-shifting method of proof. *Lynn v. Acme Metals Inc.,* No. 94 C 5633, 1995 WL 370230, at *10 (N.D. Ill. June 20, 1995). Hence, Taylor must present a *prima facie* that she is covered by a protected plan and Bekins took adverse action against her. If she succeeds, Bekins must articulate a legitimate reason for the adverse action, shifting the burden to Taylor to prove Bekins' articulated reason is pretextual. Taylor may prove pretext by showing a discriminatory reason more likely motivated Bekins or Bekins' proffered explanation is unworthy of credence. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256 (1981); *DeLuca v. Winer Industries, Inc.,* 53 F.3d 793, 797 (7th Cir. 1995); *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1112 (2d Cir. 1988).

**\*9** Bekins only challenges Taylor's ability to show she suffered an adverse employment action. At the end of her short-term disability leave, Taylor was not medically able to return to work. Bekins' two alternatives were to either discharge Taylor or place her on a long-term disability leave. Bekins contends there is only a technical difference between the two alternatives -- employees on long-term leave may continue Bekins' health insurance coverage by paying employee premiums. Because Taylor was not covered by Bekins' health insurance, Bekins maintains Taylor was not adversely affected by being terminated.

Bekins misunderstands Taylor's *prima facie* burden. The *prima facie* burden was never intended to be rigid or ritualistic. *Jackson v. Cook County,* No. 93-C 4829, 1995 WL 461758, at *3 (N.D. Ill. Aug. 1, 1995). Regardless of the purported reasons, Taylor was discharged. Discharge is specifically enumerated as an employment status change protected by section 510. Bekins' reliance on *Flaherty v. Gas Research Institute,* 31 F.3d 451, 456 (7th Cir. 1994), and *Crady v. Liberty Nat'l Bank and Trust Co.,* 993 F.2d 132, 136 (7th Cir. 1993), is misplaced. Both cases concerned transfer decisions rather than terminations. Accordingly, Taylor meets her *prima*

*facie* burden.

Bekins articulates a legitimate, non-discriminatory reason for Taylor's discharge. Bekins claims the discharge was a straightforward application of its policy that leaves of absence exceeding 90 days must be requested by the employee and will only be granted by Bekins to allow an employee to maintain health insurance eligibility.

Thus, the burden shifts to Taylor to show Bekins' articulated reason is pretextual. Taylor presents evidence that Bekins failed to follow its policies. Taylor claims Bekins did not follow its policies because she was discharged before her short-term leave ended. The short-term leave policy begins after 10 consecutive work days of illness and after all sick days are used. Taylor Dep. Ex. 2 at 21. Taylor was entitled to 12 weeks short-term disability pay. *Id.*

Bekins asserts short-term disability leave lasts 90 days (12 weeks) starting from the first day of illness. Taylor was on vacation until January 4, 1993, when she underwent surgery. Hence, Bekins claims Taylor was entitled to short-term disability leave until April 4, 1993. Taylor raises a genuine issue of material fact as to the interpretation of the leave policy. Bekins' interpretation of the short-term leave policy is not intuitive. The policy provides that leave does not commence until after 10 consecutive work days of illness. One reasonable interpretation of the policy would be that Taylor was entitled to 12 weeks leave beginning 10-work day after January 4, 1993. Accordingly, Bekins may have violated its policy in discharging Taylor on April 4, 1993.

Taylor also points to Bekins' February 1993 letter that purports to explain the "company policy as it relates to a medical leave of absence." *See* Taylor Dep. Ex. 6 at 2. The letter states if Taylor's physician verifies Taylor is medically unable to return to work, an extension of her leave of absence "will be granted" based on her length of service with the company. Bekins explained an extended leave of

Not Reported in F.Supp.                                                                                  Page 9
Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.))**

absence would allow Taylor to continue her coverage under Bekins' health insurance by paying the employee premium. Taylor was entitled to a maximum one year leave of absence dating from the last day she worked. Taylor's employment "will be terminated" at the end of the one year leave of absence if she did not return to Bekins. *Id.*

**\*10** Taylor presents evidence she complied with the February 1993 letter. Taylor's physician notified Bekins on March 19, 1993, that Taylor would not be able to return to work until the end of April. In the April 9, 1993 termination letter, Rhinesmith apparently acknowledged Taylor's request for a leave extension -- "information on your leave extension was sent to me in a letter by your physician ...." Taylor Dep. Ex. 5. Despite receiving the extended leave information, Taylor was not granted long-term leave based on her length of service.

Bekins claims long-term leave is only granted to employees covered by its health insurance carrier so they may continue their coverage without having to pay the full premium. Neither the 1991 handbook nor the February 1993 letter mention a requirement that employees must be covered by Bekins' health insurance carrier to be eligible for an extended leave of absence rather than be discharged. Accordingly, Taylor presents evidence Bekins did not have such a leave policy.

Moreover, Taylor presents other evidence Bekins' articulated reason is not credible. In addition to a health insurance plan, Bekins employees are eligible to participate in "The Bekins Long Term Disability Insurance Program" -- an ERISA-approved welfare plan. *See* Taylor Dep. Ex. 14. Bekins administers the plan and assumes the administrative costs. To be eligible under the plan, an individual must be an active, full-time Bekins employee. *Id.* at 10.Coverage terminates once an individual is no longer a member of the eligible class (*id.* at 18) -- *i.e.,* once the employee is terminated. Termination does not affect a covered loss that began before the date of termination. *Id.* The insurance remains in force during a period of disability and the plan

waives an employee's premium while she is disabled. *Id.* at 17.

Hence, Bekins employees who are terminated are no longer eligible under the plan, while employees placed on a long-term disability leave remain insured and their premiums are waived. Bekins does not explain why employees covered by the long-term disability plan are treated less favorably than employees who are covered by Bekins' health insurance plan. Bekins' decision to discharge Taylor rather than grant her an extended leave may have interfered with Taylor's right to participate in the long-term disability plan.

Taylor presents evidence Bekins' articulated reason may not be credible. Accordingly, Bekins' summary judgment motion on the section 510 ERISA claim must be denied.

## V. *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

Bekins contends it is entitled to summary judgment on the intentional infliction of emotional distress claim because Taylor cannot meet the stiff burden of proof. To succeed, Taylor must show: (1) Bekins' conduct was "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency;" (2) she suffered distress so "severe that no reasonable man could be expected to endure it;" (3) Bekins acted with knowledge that, "severe emotional distress [was] certain or substantially certain to result" from its action; and (4) Bekins' conduct arose "from an abuse of a position or a relation with another which gives the actor actual or apparent authority over the other or power to affect his interests."*Timm v. Mead Corp.,* No. 91 C 5648, 1993 WL 389425, at *12 (N.D. Ill. Sept. 30, 1993) (quoting *Public Finance Corp. v. Davis,* 360 N.E.2d 765, 767 (Ill. 1976)), *aff'd,*32 F.3d 273 (7th Cir. 1994). In the employment setting, courts are particularly strict in requiring conduct to be outrageous and extreme. *Whitehead v. AM Int'l, Inc.,* 860 F. Supp. 1280, 1290-91 (N.D. Ill. 1994); *Piech*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                              Page 10
Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.))

*v. Arthur Anderson & Co., S.C.,* 841 F. Supp. 825, 831 (N.D. Ill. 1994); *Timm,* 1993 WL 389425, at *12. The behavior must greatly exceed the "ordinary indignities one can be expected to endure in the workplace."*Jaskowski v. Rodman & Renshaw, Inc.,* 813 F. Supp. 1359, 1363 (N.D. Ill. 1993); *Pietsch,* 841 F. Supp. at 831.

**\*11** Bekins argues wrongful discharge is generally insufficient to support the intentional infliction tort. *See Timm,* 1993 WL 389425, at *12 (citing cases); *see, e.g., Pelizza v. Reader's Digest Sales & Services, Inc.,* 624 F. Supp. 806, 811 (N.D. Ill. 1985) (firing plaintiff in violation of an employment contract did not constitute extreme and outrageous conduct); *Pudil,* 607 F. Supp. at 444 (termination not outrageous even if employer knew employee relied on employer's representations of job security); *Stoecklein v. Illinois Tool Works, Inc.,* 589 F. Supp. 139, 146 (N.D. Ill. 1984) (termination not outrageous when based on age and in breach of promise to provide over two years of severance pay and job training); *Witkowski v. St. Anne's Hosp. of Chicago, Inc.,* 447 N.E.2d 1016, 1021-22 (Ill. App. Ct. 1983) (false charges concocted to justify termination and prevent plaintiff from collecting long-term disability benefits were not extreme and outrageous conduct).

Taylor acknowledges her burden is heavy. She argues Bekins' outrageous and extreme conduct is evidenced by its failure to communicate its leave policy, failure to pay vacation pay and the alleged refusal to process Taylor's long-term benefits claim for 15 months. She claims the cold and impersonal manner in which she learned of the termination decision and the fact that the termination notice came approximately nine days before her leave was to end caused her severe depression. Based on "common sense," Taylor contends Bekins acted with knowledge that her reaction was likely to be severe. Finally, as Taylor's employer and administrator of the long-term disability plan, Taylor argues Bekins was in a position of authority to affect her interests.

Taylor's arguments are unpersuasive. She fails to identify any conduct that is arguably outrageous or extreme. The cases Bekins cites support its argument that Taylor's evidence is insufficient to raise a genuine issue of material fact. If Taylor's evidence raised a genuine issue of material fact, nearly all terminated employees would have an intentional infliction of emotional distress action. Taylor's evidence simply fails to meet the demanding burden of showing outrageous and extreme conduct. Accordingly, Bekins must be granted summary judgment on the intentional infliction of emotional distress claim.

### CONCLUSION

Plaintiff's partial summary judgment motion is denied. Defendant's summary judgment motion is granted in part and denied in part. Judgment is entered in favor of defendant Bekins Van Lines, Co. and against plaintiff Peggy Taylor on the breach of contract and intentional infliction of emotional distress counts. The motion is denied as to plaintiff's implied claims under ERISA sections 510 and 404.

The parties are to present their joint final pretrial order and agreed jury instructions on February 8, 1996 at 9:00 a.m. Plaintiff shall provide defendant with a draft of her portion of the pretrial order by January 31, 1996. The case is placed on the February 1996 trial calendar.

> FN1. Taylor fails to submit the portions of Rhinesmith's deposition that support Taylor affidavit paragraphs 34, 49. Taylor also fails to submit pages 77-79, 96-98 of her own deposition.

N.D.Ill.,1996.
Taylor v. Bekins Van Lines, Co.
Not Reported in F.Supp., 1996 WL 14004 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.